UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————— x

ISSEK FUCHS and TODD AUGENBAUM, :
Individually and on Behalf of All Others :
Similarly Situated, :
:
                         Plaintiffs, :
:
            vs. :
:
SEADRILL LIMITED, JOHN FREDRIKSEN, :
PER WULLF and RUNE MAGNUS :
LUNDETRÆ, :
:
                         Defendants. :
———————————————————— x



Civil Action No.

CLASS ACTION

COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS

JUDGE SCHOFIELD

DEMAND FOR JURY TRIAL

RECEIVED
DEC 0 5 2014
U.S.D.C. S.D.N.Y.

Plaintiffs Issek Fuchs and Todd Augenbaum ("plaintiffs"), individually and on behalf of all others similarly situated, by plaintiffs' undersigned attorneys, for plaintiffs' complaint against defendants, allege the following based upon personal knowledge as to plaintiffs and plaintiffs' own acts, and upon information and belief as to all other matters based on the investigation conducted by and through plaintiffs' attorneys, which included, among other things, a review of Securities and Exchange Commission ("SEC") filings by Seadrill Limited ("Seadrill" or the "Company"), as well as conference call transcripts and media and analyst reports about the Company. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a securities class action on behalf of all purchasers of the American Depository Receipts ("ADRs") of Seadrill between July 10, 2014 and November 25, 2014, inclusive (the "Class Period"). Plaintiffs seek to pursue remedies against Seadrill and certain of its senior executives under §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule l0b-5 promulgated thereunder.

2.     Bermuda-based Seadrill is the world's largest offshore drilling contractor, providing offshore drilling services to the oil and gas industry worldwide. During the Class Period, the Company had a $12.3 billion debt load and billions of dollars of financial commitments on new ships and rigs it had under contract to be built (hereinafter, "new-builds").

3.     Seadrill has historically paid a large dividend, which it raised twice in early 2014 resulting in the Company paying a $1 per share quarterly dividend during the last two quarters of 2014. During the Class Period, defendants adamantly maintained that due to the Company's strong backlog and the strength of its balance sheet, despite any turbulence in the oil industry, the Company would not cut its $4 per share annual dividend.

- 1 -

4.     On July 8, 2014, two days before the start of the Class Period, the Company attempted to retire some of its outstanding debt through an incentive exchange offer for stock and cash. Due to a decline in the price of Seadrill shares, the exchange offer was suddenly cancelled.

5.     Two days later, on July 10, 2014, the start of the Class Period, Seadrill announced that it had successfully obtained certain refinancing commitments from banks, emphasizing that "[h]aving access to numerous markets reduces refinancing risk and leads to decreased cost of capital that ultimately maximizes value creation for shareholders. *Seadrill's diversified funding strategy has resulted in the Company being in the best possible financial situation in the Company's history, with significant financial flexibility to support the dividend* . . . ."

6.     With the price of its shares stabilized, Seadrill quickly completed the exchange offer, retiring hundreds of millions of dollars of its debt at an economically profitable exchange ratio.

7.     Throughout the Class Period, Seadrill continued to represent that not only were its backlog and strong balance sheet sufficient to support paying the $4 annual dividend through 2016, the Company expressly stated that it had affirmatively decided to continue paying the dividend to the exclusion of alternative uses for its capital. Based on the high 18.7% yield being paid on its shares, and the promise of continued dividend payments, Seadrill ADRs traded at inflated prices throughout the Class Period, reaching a Class Period high of over $38 per ADR in July 2014.

8.     When Seadrill finally reported its third quarter 2014 financial results (for the period ended September 30, 2014) on November 26, 2014, before the opening of trading, the Company shocked by the market by suddenly disclosing that in addition to missing the profit targets it had led the market to expect, Seadrill was indefinitely suspending its dividend, citing the Company's need to pay down its debt to strengthen its balance sheet. The Company also disclosed that its Board of Directors (the "Board") had authorized the repurchase of up to 10% of its outstanding shares.

9.     On this news, on November 26, 2014, the price of Seadrill ADRs plummeted from $20.71 per ADR to $15.19 per ADR on extremely heavy trading volume.

## JURISDICTION AND VENUE

10.     Jurisdiction is conferred by §27 of the Exchange Act.  The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder.  This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §§1331 and 1337, and §27 of the Exchange Act.

11.     Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b) as the Company's ADRs were traded on the New York Stock Exchange ("NYSE") in this District throughout the Class Period.

12.     In connection with the acts alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

13.     (a)     Plaintiff Issek Fuchs, as set forth in his accompanying Certification, which is incorporated by reference herein, purchased Seadrill ADRs during the Class Period and has been damaged thereby.

(b)     Plaintiff Todd Augenbaum, as set forth in his accompanying Certification, which is incorporated by reference herein, purchased Seadrill ADRs during the Class Period and has been damaged thereby.

14.     Defendant Seadrill is a Bermuda-based offshore drilling contractor that provides offshore drilling services to the oil and gas industry.  Though its common stock has been listed on the Oslo Exchange since 2005 and its ADRs only listed on the NYSE since April 2010 (both under the ticker symbol "SDRL"), its 2013 annual report states "[t]he NYSE listing is intended to be the

- 3 -

Company's 'primary listing' and the OSE listing is intended to be the Company's secondary listing." As of December 31, 2014, the Company had over 468 million shares of common stock outstanding.

15.     Defendant John Fredriksen ("Fredriksen") is, and was throughout the Class Period, the Chairman of the Seadrill Board of Directors and previously served as Seadrill's President. Defendant Fredriksen, a Norwegian-born Cypriot citizen, founded and is Seadrill's largest shareholder and beneficially owns approximately 115 million shares of its common stock.

16.     Defendant Per Wullf ("Wullf") is, and was throughout the Class Period, the Chief Executive Officer ("CEO") and President of Seadrill.

17.     Defendant Rune Magnus Lundetræ ("Lundetræ") is, and was throughout the Class Period, the Chief Financial Officer ("CFO") of Seadrill.

18.     Defendants Fredriksen, Wullf and Lundetræ are referred to herein as the "Individual Defendants."  Seadrill and the Individual Defendants are referred to herein, collectively, as "Defendants."

## CLASS ACTION ALLEGATIONS

19.     Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all purchasers of the ADRs of Seadrill during the Class Period (the "Class").  Excluded from the Class are Defendants and their families, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

20.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Seadrill ADRs were actively traded on the NYSE. While the exact number of Class members is unknown to plaintiffs at this time and can only be ascertained through appropriate discovery, plaintiffs believe that there are hundreds of thousands of

members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Seadrill and/or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

21.     Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

22.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

23.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether the Exchange Act was violated by Defendants as alleged herein;

(b)     whether statements made by Defendants misrepresented material facts about the business, operations and management of Seadrill; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

24.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

**BACKGROUND**

25.     Defendant Seadrill is the world's largest offshore drilling company by market valuation. The Company is part of the empire of shipping magnate defendant Fredriksen. Defendant Fredriksen has served as Chairman of the Board and a director of the Company since its inception in May 2005.

26.     The Company operates in three segments: Floaters, Jack-up Rigs, and Tender Rigs. The Floaters segment offers services such as drilling, completion, and maintenance of offshore exploration and production wells under contracts relating to semi-submersible rigs and drillships for harsh and benign environments in mid, deep, and ultra-deep waters. The Jack-up Rigs segment provides services that include drilling, completion, and maintenance of offshore exploration and production wells under contracts relating to jack-up rigs for operations in harsh and benign environment. The Tender Rigs segment operates self-erecting tender barges and semi-submersible tender rigs, which are used for production drilling and well maintenance in Southeast Asia and West Africa. Most of its tender rigs were sold in 2012.



Ultra-deepwater drillships like this one are a foundation of Seadrill's business. Image source: Seadrill.



Seadrill jack-up rig. Image source: Seadrill.

27.     Seadrill's customers include oil and gas exploration and production companies, including integrated oil companies, independent oil and gas producers, and government-owned oil and gas companies. The Company has operations in the nations of Angola, Brunei, the Republic of Congo, Indonesia, Malaysia, Nigeria, Norway, Thailand, Brazil, the United States and the United Kingdom, among others.

28.     The offshore drilling market is splitting into four broad segments: shallow water and ultra-deepwater, and then old rigs and new rigs.  Typically, ultra-deepwater rigs command high day-rates and long-term contracts give stability for rig owners.  Seadrill has exposure to both shallow and deepwater markets, but the ultra-deepwater market accounts for the majority of its fleet.

29.     Newer rigs offer performance and safety features that an aging fleet cannot and therefore typically find work more easily than older rigs. This is the latest bifurcation in the market with new rigs having strong utilization rates and older rigs (particularly 30+ years) having a hard time finding work and in many cases being scrapped by rig owners. Seadrill has been aggressively buying new-builds and now has the youngest fleet in the industry.

30.     More than half of the new oil reserves found in 2013 were in ultra-deepwater and more than three quarters were offshore.

### SEADRILL'S HISTORICALLY STRONG DIVIDEND

31.     Seadrill's stated dividend policy is as follows:

> ***Seadrill has an objective to generate competitive returns to its shareholders. This objective will be supported by regular distribution of cash dividend***. The level of dividend will be guided by earnings expectations, market prospects, current capital expenditure programs as well as investment opportunities.[1]

---

[1]     Seadrill Investor Relations FAQs (www.seadrill.com/investor-realtions/faqs) last visited Dec. 2, 2014.

32.    Based on the Company's practice of historically paying a strong and consistent dividend, coupled with its repeated promises to maintain that strong dividend, Seadrill was named as a Top 10 dividend paying energy stock as recently as September 2014 by *Dividend Channel*, which publishes a weekly "DividendRank" report.

33.    The September 2014 DividendRank report emphasized that among energy companies, Seadrill shares displayed both attractive valuation metrics and strong profitability metrics. The then-recent Seadrill share price of $27.68 represented a price-to-book ratio of 1.3 and an annual dividend yield of 14.46%. By comparison, the average energy stock in *Dividend Channel's* coverage universe yielded 4.5% and traded at a price-to-book ratio of 2.8.

34.    The DividendRank report also emphasized the strong quarterly dividend growth history at Seadrill, and its favorable long-term multi-year growth rates in key fundamental data points, noting that the annualized dividend paid by Seadrill was $4.00 per share, then-currently being paid in quarterly installments. Indeed, as the following chart demonstrates, the Company has a consistent and steady history of not just paying – but of raising – its quarterly dividend:

- 8 -



TickerTech.com  Sep 25, 2014

## DEFENDANTS' MATERIALLY FALSE AND
## MISLEADING CLASS PERIOD STATEMENTS

35. The Class Period starts on July 10, 2014. On that day, before the opening of trading in the United States, Seadrill issued a press release representing that it had "refinance[d] three high specification ultra-deepwater units," lauding the Company's strong balance sheet and ability to continue paying the dividend.  The press release stated in pertinent part as follows:

> Seadrill Limited ("Seadrill" or the "Company") has received commitments from 17 banks for a US$1.35 billion credit facility with a 5 year term and 10 year amortization profile to refinance the credit facilities secured by the West Pegasus, West Gemini, and West Orion.  The transaction was initially launched as a US$900 million facility secured by two ultra-deepwater units.  However, ***due to strong interest from the Company's banking group,*** the facility was upsized to US$1.35 billion by including one additional ultra-deepwater unit in the collateral package. The new loan will be priced at a margin of Libor plus 2% and was substantially oversubscribed, ***demonstrating the strength of Seadrill's credit in the banking market***.  This refinancing will provide Seadrill with US$350 million in additional cash.
>
> By concluding this transaction the Company will be left with one ultra-deepwater and four jack-up units to be refinanced in 2015 and one ultra-deepwater and four jack-up units in 2016, totalling US$1.2 billion to be refinanced.

The Seadrill Group has gone to great lengths to diversify its sources of funding through opportunistic capital raises in the secured ECA, secured bank, unsecured bond, convertible bond, term loan B, and MLP markets. *Having access to numerous markets reduces refinancing risk and leads to decreased cost of capital that ultimately maximizes value creation for shareholders. Seadrill's diversified funding strategy has resulted in the Company being in the best possible financial situation in the Company's history, with significant financial flexibility to support the dividend* and prepared to act on potentially attractive acquisition opportunities created by the temporary weakness in the market. *The Board is pleased with the significant progress made on the financing front over the last twelve months* and wants to give credit to management for hard work and solid execution.

36.     On July 18, 2014, the Company issued a press release launching a voluntary incentive

payment offer to convert its US$650 million 3.375% 2017 convertible bonds into cash and/or stock,

with the exchange rate being set higher based on the then-high price the Company's equity shares

were trading at.  The release, which explained that a previous voluntary incentive payment offer

issued two days before the start of the Class Period had to be cancelled due to a sudden decrease in

the price of Seadrill equity shares, stated in pertinent part as follows:

> Seadrill Limited ("Seadrill" or the "Company") announces today that is launching a voluntary incentive payment offer to convert any and all of the US$650 million principal amount of 3.375% Seadrill convertible bonds due 2017 (the "2017 Bonds").
>
> On July 8, 2014 Seadrill launched a voluntary exchange offer that was contingent upon the successful completion of a new convertible bond issuance.  Due to the adverse share price development on the day of the issue leading to an unfavorable conversion price, both transactions were cancelled.  A consequence of the cancellation of the incentive payment offer was that a number of convertible bondholders were harmed due to the common practice of hedging during a conversion offer.
>
> The Board bears significant responsibility to all stakeholders and never intends to harm any of the Company's loyal supporters, however, the Board was left with the difficult decision to accept an unattractive deal or create this unfortunate situation. *The Company and the Board will not be forced to transact in any market at unfavorable terms*, therefore saw cancellation as the only viable alternative.  In light of this the Board has decided to launch a new voluntary incentive payment offer which will not be contingent on the completion of any other transaction in order to counter the negative effects of last week's events.  We look forward to putting this unfortunate situation behind us and continue our innovative and cost effective funding strategy.

Seadrill hereby makes an offer of an incentive payment to the 2017 Bondholders who elect to exercise their conversion rights from this public announcement until July 24, 2014 at 5pm CET (the "Acceptance Period"). ***Bondholders may elect to receive the incentive payment in cash or in shares of Seadrill.*** If a bondholder does not make such election, they will receive the incentive payment in cash. Seadrill may at its sole discretion extend the Acceptance Period (one or more times). Seadrill will accept any acceptance of the voluntary incentive payment offer from an eligible Bondholder that is validly tendered in accordance with the terms of the voluntary incentive payment offer document during the Acceptance Period. Bondholders holding in excess of 60% of the convertible bonds outstanding have pre-committed to accept the voluntary incentive payment offer.

Bondholders exercising their conversion rights during the Acceptance Period will receive (i) 3,612 Seadrill ordinary shares per US$100,000 principal amount of the 2017 Bonds, (ii) a consideration of approximately US$11,840 per US$100,000 principal amount of the 2017 Bonds in cash or share of Seadrill (as adjusted in accordance with the incentive offer document) and (iii) accrued interest on the 2017 Bonds from April 27, 2014 (excluded) to July 28, 2014 (included).

The voluntary incentive payment offer will not affect the rights of 2017 Bondholders who do not wish to exercise their conversion rights during the Acceptance Period.

37.    On July 23, 2014, the Company issued a press release announcing that more than

84% of the holders of Seadrill bonds had accepted the incentive offer, stating in pertinent part as

follows:

Seadrill Limited is pleased to announce that holders of approximately US$547 million of Seadrill's convertible bonds due 2017 have submitted their acceptances of the voluntary conversion offer made by Seadrill on 18th July 2014. This represents approx. 84.1% of the total outstanding amount.   Bondholders in Seadrill's convertible bonds due 2017 are hereby reminded about the "90% clean-up call" as described in the Bond agreement clause 10.2.2 which gives Seadrill the right to call the remaining part of the bonds at par value plus accrued interest provided that 90% or more of the original issued amount of US$650 million have been redeemed or converted into shares.

The VWAP ("volume weighted average price") for the incentive offers, calculated in accordance with the conditions stipulated in the incentive offer, is US$37.61. As a result, the incentive payment value will be US$12,102.95 per US$100,000 principal amount of bond.

The acceptance period for the offering will close tomorrow, 24 July at 17.00 CET. ABG Sundal Collier is engaged by Seadrill as managers for the voluntary incentive offer.

38.     On July 28, 2014, the Company issued a press release announcing that since more

than 90% of the holders of its convertible bonds had accepted the incentive offer, Seadrill would

exercise the "90% clean-up call" in its bond debenture, and cash-out all of those specific bonds.  The

release stated in pertinent part as follows:

> Seadrill Limited ("Seadrill" or the "Company") is pleased to announce that holders
> of US$648.6 million of principal amount of Seadrill's convertible bonds due 2017
> have accepted the voluntary incentive offer that was made on July 18, 2014 and
> expired on July 24, 2014. The Company intends to exercise the "90% clean-up call"
> call provision on the remaining US$1.4 million outstanding.
>
> In connection with today's settlement of the voluntary incentive offer for
> early conversion of the convertible bonds, the number of common shares outstanding
> in Seadrill has increased by 23,827,751 shares. The total number of common shares
> outstanding in Seadrill is now 493,078,684 shares.

39.     On August 27, 2014, the Company issued a press release reporting its financial results

for the second quarter of 2014, ended June 30, 2014.  The caption of the release emphasized that "on

a consolidated basis," *Seadrill "maintains order backlog of approximately US$20 billion."*  The

release also announced several new multi-year service contracts and contract extensions that the

Company had obtained, promising billions of dollars in revenues.  The release also emphasized the

Company's strong operational status, stating in pertinent part as follows:

> *Offshore drilling units*
>
> During the second quarter, Seadrill had 17 floaters and 24 jack-up rigs in
> operation in Northern Europe, US Gulf of Mexico, Mexico, South America, Canada,
> West Africa, Middle East and Southeast Asia. Additionally Seadrill manages 9
> Seadrill Partners rigs comprised of 6 floaters and 3 tender rigs. Seadrill also manages
> 3 tender rigs owned by SapuraKencana.
>
> *The Board is pleased with the operational uptime in the second quarter.
> Seadrill Limited floaters (drillships and semisubmersible rigs) achieved an
> economic utilization rate of 96% in the second quarter compared to 94% in the
> first quarter.*
>
> *The economic utilization for the Seadrill Group floaters on a consolidated
> basis was 94%, a material improvement over the 88% utilization in the first*

*quarter. Operational issues have been addressed and the Seadrill Group operated within the Board's targets during the second quarter*.

Average economic utilization was 93% for our jack-up rigs in the second quarter compared to 97% in the preceding quarter. The decrease in uptime was largely a result of the mobilization of four units to Mexico.

40.   Concerning the Company's financial outlook and its ability and commitment to

continue to pay the dividend to the exclusion of other opportunities to use the same capital, the

release stated in pertinent part as follows:

### Quarterly Cash Dividend

The Board has in connection with the disclosure of second quarter results evaluated the current dividend level. Particular emphasis has been put on financial position, order backlog and future prospects. The Board has resolved to maintain the regular quarterly dividend at US$1.00 per share. *The Board had communicated earlier that this dividend level is sustainable until at least the end of 2015. With the recent contract announcements and the solid execution on the financing side, the Board is pleased to report that we feel increasingly comfortable that this period can be extended well into 2016 without any significant recovery in the market*.  As future units are introduced into the fleet, operating results are likely to show strong growth. This, combined with a more efficient debt structure as achieved by the term loan B financing, *creates opportunities for increased direct distributions to shareholders*.

\*       \*       \*

### Outlook

The Board is very pleased with the strong operating performance during the second quarter. The management team and employees did an outstanding job working through the challenges during the first quarter and the benefits of a uniform fleet were realized.  Operational excellence is a core focus of Seadrill. It leads to repeat business and has established the Company as the partner of choice for the world's leading oil companies.

In addition to operational excellence, Seadrill prides itself on being innovative; this is how best in class returns are generated for our shareholders. In 2005 we were the only driller to focus on high end assets that tend to be employed through the cycle. Industry participants recognized the success of this strategy and are attempting to replicate it to a degree. The evolution and maturity of Seadrill has brought us to a point in time where we are capable of providing both single assets and solutions to clients. This is what we have done in Mexico, Brazil, Saudi Arabia, and most recently with Rosneft. *This is an evolutionary process that continuously*

*keeps the Company on its front foot in order to drive growth and value creation for our shareholders*. The establishment of subsidiaries also creates companies focused on a particular theme and better suited to accommodate the need for more local content. For Seadrill Partners it is long term contracts, and for North Atlantic, Arctic and harsh environments. *This focus provides investors with an opportunity to participate in unique themes while at the same time providing the companies with new sources of funding*.

*After concluding the financing for the four 2015 and 2016 drillship deliveries Seadrill will only have a total of US$1.2 billion remaining to finance in 2015 and 2016*.

*The strong performance of Seadrill Partners' equity has added a new level of financial flexibility for the Company*. The distribution growth at Seadrill Partners permitted the most recent offering to be executed without a specific transaction associated with it. *We look forward to continuing to grow Seadrill Partners' distributions and asset base*. A growth rate of at least 15% is targeted, achieved by additional drop downs and operating company unit acquisitions.

After a year with very few fixtures we have started to see some increased tendering activity, however this has not influenced dayrates, where the trend is still negative. 2014 and 2015 will be challenging years; however *Seadrill Group has only one unit currently without and only 14 rig years uncommitted for 2015 out of a total fleet of 57 rig years, which translates to 76% contract coverage*.

\*       \*       \*

*Third quarter EBITDA is expected to be roughly in line with second quarter results for the Seadrill Group on a consolidated basis and the Group is on track to earn US$10 million in EBITDA per day by the end of the year*. Expectations for the third quarter includes approximately 106 days of downtime experienced on our deepwater rigs quarter to date.

The current weakening of the market caused by the oil companies cash flow situation may create interesting opportunities to acquire rig assets and companies. Seadrill will evaluate these opportunities on a case by case basis. *However, it should be stated that Seadrill's strong focus on maintaining dividend capacity and on modern assets clearly limits potential targets*.

41.     During a conference call held with investors later in the day on August 27, 2014, defendant Wullf adamantly maintained that the dividend was safe, stating in pertinent part as follows:

We are expanding our areas of operation, attracting new businesses and increasing the number of assets we own. *We also [have the] strongest financial*

*position in our history, and have decided to maintain the dividend of $1 per share. We expect to be able to support this dividend level for our foreseeable future.*

\*     \*     \*

*The expected growth, roughly $20 billion of order backlog and continued access to capital market, makes the Board highly confident in the company's ability to support the dividend well into 2016. . . .*

We executed a number of new contracts during the second quarter, adding roughly $1.5 billion to our order backlog.  We have been busy.  Contracts were secured for five jack-ups, West Tucana, West Telesto, West Ariel, and West Prospero.  And we also extended the contract for the West Mischief.

We also signed a five-year contract for the West Jupiter at a robust $567,000 a day rate. *This contract is a great win, and adds to our visibility, and dividend supporting going forward.*

\*     \*     \*

Another important contract win for us was the West Saturn.  The rate of $634,000 a day, that's another $0.5 billion of contract backlog. *It's meaningful in locking up capacity and securing our dividend payment going forward.*

42.     On September 19, 2014, the Company disclosed that defendant Fredriksen's top adviser for two decades, Tor Olav Troeim, had suddenly resigned from the Seadrill Board.

43.     On October 27, 2014, the Company disclosed that another Seadrill director, Carl Erik Steen, had suddenly resigned from the Board effective immediately.

44.     The statements referenced above in ¶¶35, 39-41 were each materially false and misleading when made as they failed to disclose and misrepresented the following adverse facts which were known to Defendants or recklessly disregarded by them:

(a)     Despite the Company's oft-repeated Class Period claims of having a strong backlog of existing work for its ships and rigs, demand for new work for Seadrill's offshore drilling equipment had fallen;

(b)     The more than 60 new-builds entering the global market in 2015 were creating an over-supply of rigs and ships in 2015 and 2016, pressuring day-rates and thus ship value;

- 15 -

(c)     Seadrill's massive $13.2 billion debt load, combined with its need to finance its new-builds, rendered the Company unable to maintain its dividend; and

(d)     as a result of the foregoing, the Company was not on track to achieve the financial results Defendants had led the market to expect during the Class Period and the dividend needed to be cut to meet Seadrill's other financial commitments.

45.     On November 26, 2014, before the opening of trading, Seadrill issued two press releases – one reporting the Company's third quarter 2014 financial results for the period ended September 30, 2014 and the other disclosing that Seadrill's Board had suspended its $4 per share annual dividend.  Defendants also disclosed that rather than spending the $2 billion paying the dividend that Seadrill had assured investors it was able to pay, the Seadrill Board had instead authorized management to buy back 10% of its outstanding shares, a move which would further consolidate defendant Fredriksen's control over the Company while simultaneously devaluing the market value of Seadrill and its equity shares.

46.     Seadrill further disclosed that it would be deferring the delivery of certain new-builds it had under contract until work could be found for those ships and rigs.

47.     The Company disclosed that economic utilization in its Floaters segment was only 89% in the third quarter of 2014, *down 7%* from the second quarter of 2014, driven by increased idle time.  Seadrill also disclosed that some 9% of its ultra-deepwater floater fleet had no jobs lined up for 2015, and 26% had no jobs lined up for 2016.  More critically, *26%* of the Company's premium jack-up rigs had no work lined up for 2015 and *61%* of its premium jack-up rigs had no work lined up for 2016.  Seadrill conceded that it would likely not find work for those rigs.

48.     Concomitantly, the Company disclosed that it had only achieved net profits of $149 million, or $0.31 per share, in the third quarter of 2014, significantly missing the $0.68 per share in

net profits the Company's bullish Class Period statements had led the market to expect, and a 40%

decline from the $286 million in net profits the Company had reported in the same quarter in 2013.

During a conference call that followed the press release later that day, defendant Lundetræ

repeatedly blamed the earnings shortfall on "the effects of idle and downtime" of certain rigs during

the third quarter of 2014.

49.     Seadrill readily admitted on November 26, 2014 that the dividend cut was required to

pay down its massive $12.3 billion debt load and to fund the nearly $6 billion in new-builds the

Company had to pay for with its weak balance sheet.  While the Company also claimed to have cut

the dividend partially to enable it to pursue other "value creating opportunities due to significant

deterioration in the broader markets," claiming it might purchase other oil servicers more distressed

than Seadrill, as *The Wall Street Journal* reported on November 26, 2014, before the opening of the

U.S. markets, quoting Sparebank1 Markets analyst Robert Andre Jensen, it was then "'hard to see

many attractive distressed assets in the short term,'" as the oil services sector would "'need to endure

a longer period of weakness for this to happen.'"

50.     *Bloomberg* reported even before the U.S. markets opened on November 26, 2014 that

the price of the shares of Seadrill, which *Bloomberg* emphasized "hadn't frozen or cut dividends in

six years," "fell the most in six years" on the Oslo exchange "after the offshore driller controlled by

billionaire John Fredriksen suspended dividends."  *Bloomberg* emphasized the lack of notice to

investors, stating that "Seadrill, which paid owners $1 a share for the first two quarters this year, *said

in August that level was sustainable until at least the end of 2015*," calling the dividend a "*surprise

decision.*" *Bloomberg* also quoted Janne Kvernland, an analyst at Nordea Markets, acknowledging in

a note to clients that morning before the U.S. markets opened that the dividend cut would "'likely

- 17 -

trigger a huge sell-off from yield investors which hold a considerable stake of the company, and pressure the share price in the near-term.'"

51.     As anticipated, on this news, the price of Seadrill ADRs, which had traded at $38.90 per share in intraday trading during the Class Period (on July 17, 2014), *plummeted over 58%* from that price to close at $15.99 per ADR on November 26, 2014, on unusual trading volume of approximately 85 million ADRs trading, or more than nine times the average daily trading volume over the preceding ten trading days, *erasing more than $10 billion in market capitalization* from the ADRs' Class Period high.

52.     The market for Seadrill ADRs was open, well-developed and efficient at all relevant times.  As a result of these materially false and misleading statements and omissions as set forth above, Seadrill ADRs traded at artificially inflated prices during the Class Period.  Plaintiffs and other members of the Class purchased or otherwise acquired Seadrill ADRs relying upon the integrity of the market price of Seadrill ADRs and market information relating to Seadrill, and have been damaged thereby.

53.     During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Seadrill ADRs, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading.  Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

54.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused, or were a substantial contributing cause, of the damages sustained by plaintiffs and other members of the Class.  As described herein, during the

- 18 -

Class Period, Defendants made or caused to be made a series of materially false or misleading statements about Seadrill's business, prospects, and operations. These material misstatements and omissions had the cause and effect of creating, in the market, an unrealistically positive assessment of Seadrill and its business, prospects, and operations, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in plaintiffs and other members of the Class purchasing Seadrill ADRs at artificially inflated prices, thus causing the damages complained of herein. When the true facts about the Company were revealed to the market, the inflation in the price of Seadrill ADRs was removed and the price of Seadrill ADRs declined dramatically, causing losses to plaintiffs and the other members of the Class.

## ADDITIONAL SCIENTER ALLEGATIONS

55.     As alleged herein, Seadrill and the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, these Defendants, by virtue of their receipt of information reflecting the true facts regarding Seadrill, their control over, and/or receipt and/or modification of Seadrill's allegedly materially misleading statements and/or their associations with the Company which made them privy to confidential proprietary information concerning Seadrill, participated in the fraudulent scheme alleged herein.

## NO SAFE HARBOR

56.     The "Safe Harbor" warnings accompanying Seadrill's reportedly forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from

liability. To the extent that projected revenues and earnings were included in the Company's financial reports prepared in accordance with GAAP, including those filed with the SEC on current reports, they are excluded from the protection of the statutory Safe Harbor. *See* 15 U.S.C. §78u-5(b)(2)(A).

57.     Defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of Seadrill who knew that the FLS was false. None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

### APPLICATION OF PRESUMPTION OF RELIANCE:
### FRAUD ON THE MARKET

58.     Plaintiffs will rely upon the presumption of reliance established by the fraud on the market doctrine in that, among other things:

(a)     Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)     The omissions and misrepresentations were material;

(c)     Seadrill ADRs traded in an efficient market;

(d)     The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of Seadrill ADRs; and

(e)     Plaintiffs and other members of the Class purchased Seadrill ADRs between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

59.     At all relevant times, the market for Seadrill ADRs was efficient for the following reasons, among others:

(a)     As a regulated issuer, Seadrill filed periodic public reports with the SEC; and

(b)     Seadrill regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services.

## LOSS CAUSATION/ECONOMIC LOSS

60.     During the Class Period, as detailed herein, Defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Seadrill ADRs and operated as a fraud or deceit on Class Period purchasers of Seadrill ADRs by misrepresenting the value of the Company's business and prospects by overstating its earnings and concealing the significant defects in its internal controls.   As Defendants' misrepresentations and fraudulent conduct became apparent to the market, the price of Seadrill ADRs fell precipitously, as the prior artificial inflation came out of the price.   As a result of their purchases of Seadrill ADRs during the Class Period, plaintiffs and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## COUNT I

### For Violations of §10(b) of the Exchange Act and Rule 10b-5
### Against Defendants Seadrill, Wullf and Lundetræ

61.     Plaintiffs incorporate ¶¶1-60 by reference.

62.     During the Class Period, defendants Seadrill, Wullf and Lundetræ disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

63.     The defendants named in this Count violated §10(b) of the Exchange Act and Rule 10b-5 in that they: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiffs and others similarly situated in connection with their purchases of Seadrill ADRs during the Class Period.

64.     Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Seadrill ADRs.  Plaintiffs and the Class would not have purchased Seadrill ADRs at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by these defendants' misleading statements.

## COUNT II

### For Violations of §20(a) of the Exchange Act
### Against All Defendants

65.     Plaintiffs incorporate ¶¶1-64 by reference.

66.     The Individual Defendants acted as controlling persons of Seadrill within the meaning of §20(a) of the Exchange Act.  By reason of their positions with the Company, and their ownership of Seadrill ADRs, the Individual Defendants had the power and authority to cause Seadrill to engage in the wrongful conduct complained of herein.  Seadrill controlled Individual Defendants Wullf and

- 22 -

Lundetræ and all of the Company's employees.  By reason of such conduct, these defendants are liable pursuant to §20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs pray for relief and judgment, as follows:

A.     Determining that this action is a proper class action, designating plaintiffs as Lead Plaintiffs and certifying plaintiffs as Class representatives under Rule 23 of the Federal Rules of Civil Procedure and plaintiffs' counsel as Lead Counsel;

B.     Awarding compensatory damages in favor of plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.     Awarding such equitable/injunctive or other relief as deemed appropriate by the Court.

## JURY DEMAND

Plaintiffs demand a trial by jury.

DATED:  December 5, 2014                    ROBBINS GELLER RUDMAN
                                            & DOWD LLP
                                            SAMUEL H. RUDMAN
                                            MARY K. BLASY


                                            _____
                                            SAMUEL H. RUDMAN

58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
mblasy@rgrdlaw.com

ABRAHAM, FRUCHTER & TWERSKY, LLP
JEFFREY S. ABRAHAM
One Penn Plaza, Suite 2805
New York, NY  10119
Telephone:  212/279-5050
212/279-3655 (fax)
jabraham@aftlaw.com

Attorneys for Plaintiffs

## PLAINTIFF CERTIFICATION PURSUANT TO THE FEDERAL SECURITIES LAWS

Issek Fuchs ("Plaintiff") declares, as to the claims asserted under the federal securities laws, that:

1.    Plaintiff has reviewed a copy of the class action complaint prepared by counsel with respect to SeaDrill Limited ("SeaDrill" or the "Company") against the Company, John Fredriksen, Per Winther Wulff and Rune Magnus Lundtrae and has authorized its filing.

2.    Plaintiff did not purchase SeaDrill stock at the direction of Plaintiff's counsel or in order to participate in any private action arising under the federal securities laws.

3.    Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4.    During the proposed class period, Plaintiff executed the following transactions in the securities of  SeaDrill during the period of July 10, 2014 through November 25, 2014, set forth below:

| Date | Quantity | Price Per Share | Transaction Type |
|------|----------|-----------------|------------------|
| 8/20/14 | 150 | $37.37 | Purchase |
| 11/4/14 | 500 | $20.70 | Purchase |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

5.    In the past three years, Plaintiff has not served, nor sought to serve, as a representative party on behalf of a class in an action filed under the federal securities laws.

6.    Plaintiff will not accept payment for serving as a representative party on behalf of a class beyond Plaintiff's *pro rata* share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 2nd day of December, 2014.

Issek Fuchs

-2-

## PLAINTIFF CERTIFICATION PURSUANT TO THE FEDERAL SECURITIES LAWS

Todd Augenbaum ("Plaintiff") declares, as to the claims asserted under the federal securities laws, that:

1.      Plaintiff has reviewed a copy of the class action complaint prepared by counsel with respect to SeaDrill Limited ("SeaDrill" or the "Company") against the Company, John Fredriksen, Per Winther Wulff and Rune Magnus Lundtrae and has authorized its filing.

2.      Plaintiff did not purchase the security that is the subject of the complaint at the direction of Plaintiff's counsel or in order to participate in any private action arising under the federal securities laws.

3.      Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4.      During the proposed class period of July 10, 2014 through November 25, 2014, Plaintiff executed the following transactions in the securities of SeaDrill set forth below:

| Date | Quantity | Price Per Share | Transaction Type |
|---|---|---|---|
| 10/2/14 | 100 | $24.8572 | Purchase |
| 11/4/14 | 100 | $20.8165 | Purchase |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

5.      In the past three years, Plaintiff has not served, nor sought to serve, as a representative party on behalf of a class in an action filed under the federal securities laws.

6.      Plaintiff will not accept payment for serving as a representative party on behalf of a class beyond Plaintiff's *pro rata* share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 2nd day of December, 2014.

Todd Augenbaum