UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
:
:
:
In re SEADRILL LIMITED SECURITIES          :
LITIGATION                                 :
:
:
:
:
-------------------------------------------------------------X

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:___06/20/2016___
```

14 Civ. 9642 (LGS)

**<u>OPINION AND ORDER</u>**

LORNA G. SCHOFIELD, District Judge:

Purchasers of Seadrill Limited ("Seadrill") securities bring this putative class action lawsuit against Seadrill, its subsidiary and their officers, seeking remedies under the Securities Exchange Act of 1934. Defendants move to dismiss the Consolidated Amended Complaint (the "Complaint") pursuant to Federal Rules of Civil Procedures 9(b), 12(b)(6) and the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4, and to strike allegations in the Complaint against a non-party pursuant to Rule 12(f). For the reasons below, the motion to dismiss is granted and the motion to strike is denied as moot.

## I. BACKGROUND

The following facts are taken from the Complaint unless otherwise stated, and are taken from documents integral to the Complaint and documents of which a court may take judicial notice. *See Wilson v. Merrill Lynch & Co.*, 671 F.3d 120, 123 (2d Cir. 2011). They are presumed to be true for purposes of this motion.

### A. The Parties

Lead Plaintiffs Sheldon Glow; Zalman Harari, IRA; Zalman Harari; Zalman Harari as Custodian for Solomon A. Mandel UTMA; Aviva Harari IRA; Aviva Harari; Zalman and Aviva

Harari and Abraham S. Harari IRA; and additional named plaintiffs Jeffrey Greenberg and Wing Lee (collectively, "Plaintiffs") purchased Seadrill securities.   Plaintiffs bring this putative class action on behalf of all purchasers of Seadrill securities on U.S. exchanges between July 30, 2014, and April 21, 2015 (the "Class Period"), seeking remedies under the Securities Exchange Act of 1934.

Defendant Seadrill is a Bermuda company with executive offices in the United Kingdom and Norway.   Seadrill owns and operates sea-based oil drilling rigs that it contracts out to oil exploration and development companies to drill and prepare offshore oil wells for production. Seadrill provides its rigs at a per diem rate, called "dayrate" basis, for periods between one and seven years.  Future expected revenues based on signed contracts are reported as "backlog." Seadrill's stock is publicly traded in the United States.

Seadrill is managed by Seadrill Management Limited ("Seadrill Management"). Defendant Per Wullf was appointed Chief Executive Officer ("CEO") and President of Seadrill Management in July 2013 and continues in this position today.  Defendant Rune Magnus Lundetræ was Chief Financial Officer and Vice President of Seadrill Management between February 2012 and June 2015.

Defendant North Atlantic Drilling Limited ("NADL") -- a Bermuda company with executive offices in Norway -- is a 70.4%-owned subsidiary of Seadrill and specializes in operating oil rigs in harsh environments.  NADL's stock is publicly traded, and Seadrill consolidates NADL's results onto its balance sheet.  Defendant Alf Ragnar Løvdal has served as NADL's CEO since January 1, 2013.

**B. Before the Class Period -- February 2014 to July 29, 2014:  Russia Annexes Crimea, International Sanctions and the Two Rosneft Contracts**

Prior to the start of the Class Period, in February 2014, Ukraine's pro-Russian president, Viktor Yanukovych, left office.  Several days later, Russia invaded the Crimean peninsula and clashed with Ukrainian forces.  Approximately one month later, Russia annexed the Crimean peninsula and began to supply arms to Ukrainian separatists in Ukraine's Donbass regions.  In August 2014, Russia invaded the region.

Western governments, including the United States, expressed outrage at Russia's invasion and responded by imposing sanctions on Russia.  The first sanctions imposed by the United States took the form of sanctions prohibiting U.S. persons from dealing with Specially Designated Persons ("SDN").  On April 28, 2014, the United States added to the list of SDNs Igor Sechin, President of Rosneft OAO ("Rosneft"), an integrated oil company that is majority-owned by the Government of Russia.

On May 26, 2014, Seadrill and NADL announced that they had reached an agreement with Rosneft to develop Russia's Artic oil deposits (the "Rosneft Framework Agreement").  The major terms of the Rosneft Framework Agreement were that Rosneft would contract with NADL for thirty-five rig years and acquire an equity stake in NADL in exchange for land drills and a cash payment.

On July 16, 2014, the European Union ("EU") and the United States announced additional sanctions against Russia.  The United States imposed sectoral sanctions that included the Russian energy sector.  The Court takes judicial notice that the sanctions prohibited U.S. persons from providing new financing to certain Russian firms, including Rosneft.[1]  *See Apotex*

---

[1] This fact was also incorporated implicitly by the Complaint, which noted that on July 16, 2014, the U.S. announced escalated sanctions against Russia, and that Rosneft was one of the four

*Inc. v. Acorda Therapeutics, Inc.*, No. 14-4353-cv, 2016 WL 2848911, at *5, n.3 (2d Cir. May 16, 2016) (finding that a court can take judicial notice of a document on a motion to dismiss, without converting it into a motion for summary judgment, where the document "is publicly available and its accuracy cannot reasonably be questioned.") (citing *Kramer v. Time Warner Inc.*, 937 F.2d 767, 773 (2d Cir. 1991)).

The next day, on July 17, 2014, Russian-backed Ukrainian separatists or Russian nationals shot down civilian Malaysia Airlines Flight 17.  In response to the shooting, on July 29, 2014, the EU announced that it would issue sanctions targeting entire sectors.  According to the press release, the EU would curtail Russian access to sensitive technologies, including in the oil sector.  The press release further stated that the sanctions would be published on July 31, 2014, and would become effective one day later.

On July 29, 2014, Seadrill, NADL and Rosneft entered into agreements for the use of six rigs valued at $4.25 billion pursuant to the Rosneft Framework Agreement (all of the Rosneft contracts together, the "Rosneft Deal").  The July contracts were slated to commence on various dates from 2015 through 2017.  Either party could cancel the contracts before November 10, 2014.

### C.  The Class Period -- July 30, 2014 to April 21, 2015: Further International Sanctions and Termination/Delay of the Rosneft Contracts

At the start of the Class Period on July 30, 2014, Norway announced that it would join any sanctions imposed by the EU or the United States.  On July 31, 2014, the EU published its regulations, which required EU citizens and entities to obtain prior authorization for the sale,

---

companies named.  The sanctions were announced by the U.S. Department of Treasury.  *See* Press Release, U.S. Dep't of Treasury, Actions Implement Executive Order 13662 against Two Russian Financial Institutions and Two Energy Firms (July 16, 2014), *available at* https://www.treasury.gov/press-center/press-releases/Pages/jl2572.aspx.

supply, transfer or export of enumerated technologies for use in Russia, including certain technologies suited to the oil industry for use in deep water oil exploration and production.  The regulations stated that authorities would not grant authorization if they had reasonable grounds to determine that the technology was for use in deep water or Artic oil projects in Russia.  The regulations also stated that authorization may be granted if the request concerned the execution of an obligation arising from a contract or agreement concluded before August 1, 2014.

On August 1, 2014, the U.S. Commerce Department's Bureau of Industry and Security published an advance copy of rules, scheduled to go into effect on August 6, 2014.  These rules required parties to obtain a license in order to "export, reexport or transfer (in-country)" certain items, where the party to the transaction knew or was unable to determine whether the items would be used in offshore oil exploration or production in Russia.  The rules stated that license requests would be subject to a presumption of denial when for use directly or indirectly for exploration or production from deepwater or Artic offshore oil projects in Russia.  The rules, incorporated into the Complaint by reference, published on August 6, 2014, in the Federal Register stated that it did not include a savings clause and therefore did not exempt licenses obtained prior to the imposition of sanctions.

On August 11, 2014, Norway announced that it would adopt sanctions mirroring the EU's sanctions.  Norway's sanctions, adopted August 15, 2014, required parties to obtain prior authorization to export products to be used for deepwater oil exploration and production, but also stated that authorization can and will normally be given to honor obligations under contracts agreed to before August 15, 2014.  NADL first sought authorization under the August 15, 2014, Norwegian sanctions on October 14, 2014.

On August 22, 2014, NADL announced that it had completed another agreement pursuant to the Rosneft Framework Agreement.  Under this agreement, NADL agreed to purchase 150 of Rosneft's land-drilling rigs and to award new five-year contracts with Rosneft for those units.  In exchange, Rosneft would receive an approximately 30% stake in NADL.

In September and October 2014, the United States, EU and Norway adopted additional sanctions against Russia and its oil and gas industry.  On September 12, 2014, the EU prohibited the provision of drilling and specialized floating vessels necessary for deepwater and Arctic oil exploration and production.  These sanctions were without prejudice to execution of obligations arising before September 12, 2014.  That same day, the United States expanded sanctions to prohibit provision of goods, services or technology to Rosneft in support of deepwater or Artic projects that have the potential to produce oil, provided that U.S. persons had fourteen days to comply.  On October 10, 2014, Norway enacted sanctions that mirrored the September 12, 2014, EU sanctions.

On November 7, 2014, NADL issued a press release announcing that it, Seadrill and Rosneft had mutually agreed to delay the Rosneft Deal until the end of May 2015 and that the termination rights under those agreements had also been extended to the end of May 2015.  The Court takes judicial notice of this press release, which was attached as Exhibit 1 to NADL's Form 6-K filed with the SEC on November 25, 2014.  *See Kramer*, 937 F.2d at 773-74) ("[A] district court may take judicial notice of the contents of relevant public disclosure documents required to filed with the SEC as facts 'capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.'") (quoting Fed. R. Evid. 201(b)(2)).

In a November 26, 2014, earnings call to discuss its third quarter 2014 results, NADL announced that it had suspended its quarterly cash dividend for the third quarter.  On the same

day, Seadrill released its third quarter 2014 results and announced that it was suspending its

dividend.  Seadrill's stock price fell from $20.71 per share to $15.99 per share on November 26,

2015.

Several months later, on March 13, 2015, NADL announced that Rosneft had terminated

the contract for the West Navigator (one of the contracted rigs) and that NADL had removed the

corresponding $1.0 billion of related anticipated revenue from its backlog.  Seadrill's stock price

fell from its previous close of $9.68 to a close of $9.12 on March 13, 2015.  On April 17, 2015,

NADL announced that, rather than terminate the remaining Rosneft contracts, NADL and

Rosneft had mutually agreed to extend their termination dates until May 31, 2017.  Shortly

thereafter, on April 21, 2015, the end of the Class Period, NADL and Seadrill each removed the

remaining $3.1 billion of anticipated revenue related to the rig contracts from their respective

backlog.  On April 21, 2015, Seadrill's stock fell from its previous close of $11.67 to a close of

$11.05.

### D.  Alleged Material Misrepresentations and Omissions

Plaintiffs allege that, during the Class Period, Defendants violated the Exchange Act by

making material misrepresentations and omissions that fall into two categories.[2]  The first

category consists of statements regarding the Rosneft Deal (the "Rosneft Deal Statements").  The

Rosneft Deal Statements include the following:

---

[2] Plaintiffs' Complaint initially identifies four categories of alleged misrepresentations and
omissions, but Plaintiffs' memorandum of law in opposition to Defendants' motion to dismiss
addresses only Defendants' arguments and claims that just two categories of misrepresentations
and omissions are actionable.  The Court, therefore, considers only the misrepresentations argued
in the Plaintiffs' memorandum of law in opposition to Defendants' motion to dismiss.  *See
Davison v. Ventrus Biosciences, Inc.*, No. 13 Civ. 3119, 2014 WL 1805242, at *11 n.9 (S.D.N.Y.
May 5, 2014) (finding a party conceded through silence arguments by its opponents that it failed
to address).

- In an August 22, 2014, newspaper article, Defendant Lundetræ stated on behalf of Seadrill that "we are not very worried" about sanctions.

- In an August 27, 2014, earnings call, Defendant Løvdal made three challenged statements on behalf of NADL: (i) "With regards to sanctions, obviously we have worked on that and we have established procedures and guidelines [on] how to handle that.  And also we monitor the situation continuously, because we obviously want to be in compliance with rules and regulations.  So far that has been okay."  (ii) "[W]ith regard to sanctions and so on[,] [y]es, we have had counseling of that and we are okay with the situation as of now." (iii) "[W]e have follow[ed] the situation and we have implemented procedures [on] how to make sure that we are . . . in compliance with rules and regulations[,] and we monitor that situation every week and take needed actions."

- During presentations at the Pareto Offshore Oil Conference ("Pareto Conference"), NADL's presentation on September 10, 2014 included a statement that NADL had a "solid contract backlog of US$6.3 Bn"; and Lundetræ stated on September 11, 2014, that Seadrill's "contract wins [equaled] increased dividend visibility . . . from 2015 to well into 2016" citing in particular that the Rosneft contract was adding 30 rig years and $4.1 billion in backlog.

- In a September 22, 2014, Form 6-K, Seadrill attached its Q2 2014 Earnings Release, which described, among other things, the Rosneft Framework Agreement, the July 2014 Rosneft agreements, and the total revenue potential from the July agreements of US$4.1 billion.

Plaintiffs argue in support of their opposition to Defendants' motion to dismiss that the Rosneft Deal Statements were materially false or misleading because they failed to disclose (i) that Defendants had privately expressed concerns about viability of the Rosneft Deal due to the sanctions and (ii) that NADL had not yet requested an exemption from sanctions imposed by the Norwegian government, which NADL did on October 14, 2014.

The second category of alleged misstatements concerns Seadrill's dividends (the "Dividend Statements").  The Dividend Statements include the following:

- In an August 27, 2014, press release, Seadrill stated, "The Board has in connection with the disclosure of second quarter results evaluated the current dividend level.  Particular emphasis has been put on financial position, order backlog and future prospects.  The Board has resolved to maintain regular quarterly dividend at US$1.00 per share.  The Board has communicated earlier that this dividend level is sustainable until at least the end of 2015.  With the recent contract announcements and the solid execution on the financing side, the Board is pleased to report that we feel increasingly comfortable that

this period can be extended well into 2016 without any significant recovery in the market."

- In an August 27, 2014, earnings call, Wullf stated on behalf of Seadrill, "We also have [the] strongest financial position in our history and have decided to maintain the dividend of $1 per share. We expect to be able to support this dividend level for [the] foreseeable future." He further stated, "The expected growth trajectory, roughly $20 billion of order backlog and continuous access to capital market makes the board highly confident in the company's ability to support the dividend well into 2016."

Plaintiffs argue that the Dividend Statements were false or misleading because Defendants failed to disclose that, because of international sanctions, the Rosneft Deal was at increased risk of being terminated, and if it were terminated, Seadrill would likely be unable to pay its dividend.

E.    **Defendants' Cautionary Statements**

Seadrill's Form 20-F, filed in April 2014, approximately three months before the Class Period, stated: "Certain of our customers or other parties that we have entered into contracts with may be affiliated with persons or entities that are the subject of sanctions imposed by the United States, the European Union and/or other international bodies as a result of the annexation of Crimea by Russia in March 2014. If we determine that such sanctions require us to terminate existing contracts or if we are found to be in violation of such applicable sanctions, our results of operations may be adversely affected or we may suffer reputational harm." This filing further stated: "[W]e believe that we are in compliance with all applicable sanctions and embargo laws and regulations, and intend to maintain such compliance. However, there can be no assurance that we will be in compliance in the future, particularly as the scope of certain laws may be unclear and may be subject to changing interpretations." NADL's Form 20-F filed in April 2014 contained similar statements.

In an August 1, 2014, *Financial Times* article, Lundetræ stated on behalf of Seadrill: "These contracts [with Rosneft announced July 29] are the beginning to a very interesting partnership with Rosneft. The timing of the sanctions is unfortunate. It's more about future

opportunities."  He further stated that there was "geopolitical risk" to the Rosneft Deal and that "[i]t's difficult to understand the full implications yet."

Seadrill's earning release on August 27, 2014, filed on Form 6-K with the Securities and Exchange Commission ("SEC") on September 22, 2014, stated:  "Following the signing of the offshore agreements [with Rosneft, described above,] new government regulations were announced that apply to offshore drilling activities in Russia.  We are currently evaluating the situation and monitoring all developments."  This earnings release also included cautionary language as to forward looking statements, including risks from "changes in governmental regulations that affect the Company or the operations of the Company's fleet," and referenced the risks described in Seadrill's prior SEC filings, "including its . . . Form 20-F."

Seadrill's earnings release dated November 26, 2014, which was filed on Form 6-K with the SEC on December 1, 2015, warned that the Rosneft Deal "can be cancelled by either party before the end of May 2015."

In a September 11, 2014, news article, Lundetræ acknowledged that Seadrill and NADL "have to be open" to the possibility that the contracts could be in breach of existing sanctions and that it was "terribly difficult" to determine whether they were in compliance.

NADL's earnings release dated February 26, 2015, filed on Form 6-K on February 27, 2015, stated:  "Due to recent developments and events, [NADL] believes that it will be very challenging to close the transactions on the same terms or in the timeframe contemplated in the executed agreements.  Hence there are significant risks attached to the US$4.1 billion order back-log related to the drilling contracts with Rosneft."

## II. STANDARD

Pursuant to Federal Rule of Civil Procedure 12(b)(6), "[t]o survive a motion to dismiss, a complaint must plead contain sufficient factual matter, accepted as true, to 'state a claim that is plausible on its face.'" *Employees' Ret. Sys. Of Gov't of the Virgin Islands v. Blanford*, 794 F.3d 297, 304 (2d Cir. 2015) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

Plaintiff asserts claims under § 10(b) of the Exchange Act and its implementing rule, Rule 10b-5. That rule makes it unlawful "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5. To allege a violation of § 10(b) and Rule 10b-5, "a plaintiff must allege that [each] defendant (1) made misstatements or omissions of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which the plaintiff relied, and (5) that the plaintiff's reliance was the proximate cause of its injury." *Indiana Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 93 (2d Cir. 2016) (quoting *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 105 (2d Cir. 2007).

"Any complaint alleging securities fraud must satisfy the heightened pleading requirements of the PSLRA and Fed. R. Civ. P. 9(b) by stating with particularity the circumstances constituting fraud." *Blanford*, 794 F.3d at 304 (quoting *ECA, Local 134 IBEW Joint Pension Tr. Of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2008)). "A securities fraud complaint based on misstatements must (1) specify the statements that the

plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *ATSI*, 493 F.3d at 99.  Allegations of fraud may be "too speculative even on a motion to dismiss," particularly when premised on "'distorted inferences and speculations.'" *Id.* at 104 (citing and quoting *Segal v. Gordon*, 467 F.2d 602, 606, 608 (2d Cir. 1972)).

"The PSLRA expanded on the Rule 9(b) standard, requiring that 'securities fraud complaints specify each misleading statement; that they set forth the facts on which [a] belief that a statement is misleading was formed; and that they state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *Anschutz Corp. v. Merrill Lynch & Co.*, 690 F.3d 98, 108 (2d Cir. 2012) (quoting *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 345 (2005)).  "For an inference of scienter to be strong, 'a reasonable person [must] deem [it] cogent and *at least as compelling* as any opposing inference one could draw from the facts alleged.'" *ATSI*, 493 F.3d at 99 (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007)) (alterations and emphasis in original).

"To prove liability against a corporation, of course, a plaintiff must prove that an agent of the corporation committed a culpable act with the requisite scienter, and that the act (and accompanying mental state) are attributable to the corporation." *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 195 (2d Cir. 2008).

In addition to a § 10(b) claim, the Complaint also asserts a claim under §20(a) of the Exchange Act.  To state a claim under § 20(a), the complaint must sufficiently plead "(1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." *Carpenters Pension Trust Fund of St. Louis v. Barclays PLC,* 750 F.3d 227,

236 (2d Cir. 2014) (internal quotation marks omitted).  If the Complaint does not allege a primary violation, then the § 20(a) claim must be dismissed.

## III.  DISCUSSION

In essence, the Complaint alleges securities fraud based on failure to disclose the risk that significant contracts between NADL and the Russian company Rosneft would be thwarted by international sanctions following Russia's invasion of the Ukraine and annexation of the Crimean Peninsula in March 2014.  This is not a case of hidden liabilities or misdeeds, that when disclosed, caused a company to falter and its stock price to fall.  Instead, the Complaint fundamentally alleges a failure to warn sufficiently of sanctions targeted specifically at Rosneft, that were not within Defendants' control and about which they had no special insight or information.  Because the Complaint alleges no actionable misstatement or omission, and alleges no fraudulent intent, the Complaint is dismissed.

### A.  Material Misrepresentations and Omissions

#### 1.  Applicable Law

As noted above, the first element of a Rule 10b-5 violation is that the defendant made a misstatement or omission of material fact.  "[It] bears emphasis that § 10(b) and Rule 10b-5 do not create an affirmative duty to disclose any and all material information.  Disclosure is required under these provisions only when necessary to make . . . statements made, in the light of the circumstances under which they were made, not misleading."  *Matrixx Initiatives, Inc. v. Sircusano*, 563 U.S. 27, 44 (2011) (quoting Rule 10b-5, 17 C.F.R. § 240.10b-5).

A statement or omission is materially misleading when there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available" to the market.  *Id.*

13

(internal quotation marks omitted).  The "materiality hurdle" is, therefore a "meaningful pleading obstacle," *In re ProShares Tr. Sec. Litig. v. ProShares Tr.,* 728 F.3d 96, 102 (2d Cir. 2013). Because materiality is a mixed question of law and fact, a claim may not be dismissed "on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance."  *Carpenters Pension Trust Fund,* 750 F.3d at 235 (citation omitted).

Some alleged misstatements, like "expressions of puffery and corporate optimism[,] do not give rise to securities violations."  *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004). "[A]s long as the public statements are consistent with reasonably available data, corporate officials need not present an overly gloomy or cautious picture of current performance and future prospects."  *Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000).

The PSLRA provides a safe harbor for forward-looking statements.  *See* 15 U.S.C. § 78u-5(c).  Forward-looking statements are those that contain, among other things, "a projection of revenues, income, [or] earnings," "plans and objectives of management for future operations," or "a statement of future economic performance."  *Id*. § 78u-5(i)(1).  A forward-looking statement is not actionable if it "is identified and accompanied by meaningful cautionary language or is immaterial or the plaintiff fails to prove that it was made with actual knowledge that it was false or misleading."  *Slayton v. Am. Exp. Co*., 604 F.3d 758, 766 (2d Cir.2010) (describing 15 U.S.C. § 78u-5(c)).  To qualify as "meaningful," cautionary language "must convey substantive information about factors that realistically could cause results to differ materially from those projected in the forward-looking statements."  *Id*. at 771 (quoting H.R. Conf. Rep. 104-369, at 43 (1995)).

In general, "subjective statements of opinion are generally not actionable as fraud." *In re Sanofi Sec. Litig.*, 87 F.Supp.3d 510, 528 (S.D.N.Y. 2015), *aff'd sub nom. Tongue v. Sanofi*, 816 F.3d 199 (2d Cir. 2016).  However, "'liability for making a false statement of opinion may lie if either 'the speaker did not hold the belief she professed' or 'the supporting fact she supplied were untrue.'"  *Sanofi*, 816 F.3d at 210 (quoting *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 135 S. Ct. 1318, 1327 (2015).  In addition, "opinions, though sincerely held and otherwise true as a matter of fact, may nonetheless be actionable if the speaker omits information whose omission makes the statement misleading to a reasonable investor."  *Id.* (citing *Omnicare*, 135 S. Ct. at 1332).  For an omission from an opinion to be actionable, "[t]he investor must identify particular (and material) facts going to the basis for the issuer's opinion -- facts about the inquiry the issuer did or did not conduct or the knowledge it did or did not have -- whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context."  *Id.* at 209 (quoting *Omnicare,* 135 S. Ct. at 1332).  In other words, the opinion must "fairly align[] with the information in the issuer's possession at the time."  *Id.* at 210 (quoting *Omnicare,* 135 S. Ct. at 1329).  Establishing liability based on this theory -- omissions from opinions -- "is no small task for an investor."  *Id.* (quoting *Omnicare,* 135 S. Ct. at 1332).  "[A] statement of opinion 'is not necessarily misleading when an issuer knows, but fails to disclose, some fact cutting the other way.'"  *Id.* (quoting *Omnicare,* 135 S. Ct. at 1329).

Statements of opinion must be considered in context.  For example, an opinion in a formal SEC filing, is not expected "to reflect baseless off-the-cuff judgments."  *Id.* (quoting *Omnicare*, 135 S. Ct. at 1330).  Also, "an investor reads each statement within such a document .

. . in light of all its surrounding text, including hedges, disclaimers, and apparently conflicting information."  *Id.* (quoting *Omnicare,* 135 S. Ct. at 1330) (alteration in original).

### 2.  Application

The Complaint does not sufficiently allege a material misrepresentation or omission.

### a.  The Rosneft Deal Statements

With respect to the Rosneft Deal Statements, Plaintiffs argue that these statements are false and misleading because Defendants failed to disclose that (1) NADL had not yet applied to Norwegian authorities for an exemption from sanctions imposed on August 15, 2014; and (2) Defendants privately expressed concerns about the viability of the Rosneft deals.  Both arguments fail.  These statements and omissions do not support a claim for securities fraud.

### i.  Failure to Disclose NADL Had Not Yet Applied for Exemption

In an apparent effort to remove at least some of their claims from the realm of opinions and predictions, Plaintiffs allege that Defendants' Rosneft Deal Statements were misleading because they failed to disclose the fact that NADL had not yet applied for exemption from the Norwegian sanctions.  The statements relevant to this omission are necessarily limited to the two-month period between August, 15, 2014 and October 14, 2014 -- Norway adopted the sanctions in question on August 15, 2014, and NADL applied for authorization under the sanctions on October 14, 2014.  In their briefing, Plaintiffs focus on five allegedly misleading statements.

 As to the first two Roseneft Deal Statements, on August 22, 2014 and August 27, 2014, Plaintiffs argue that the challenged statements imply that Seadrill had already obtained authorization, and that Defendants should have disclosed that they had not yet applied. However, statements that "we are not very worried" about sanctions, and "we have implemented

procedures [to ensure compliance and] monitor that situation every week and take needed actions," both made less than two weeks after the sanctions were imposed, do not suggest that Seadrill had already applied for, much less obtained authorization.  No disclosure of the status of the application was necessary to avoid making a misleading statement in this instance. Accordingly, this argument fails.

As to the two Roseneft Deal Statements about projected revenues from the newly signed Rosneft contracts at the Pareto Conference on September 10-11, 2014, and statements in Seadrill's Q2 2014 Earnings Release on September 22, 2014 -- these are forward looking statements that fall within the PSLRA's safe harbor in one or more ways.  *See* 15 U.S.C. § 78u-5(i)(1)(A) (defining forward looking statements to include "a projection of revenues, income, [or] earnings").  First, the earnings release contains cautionary statements.  The same page that mentions the $4.1 billion order backlog, states that after the Rosneft contracts were signed, new governmental regulations were announced that Seadrill was evaluating and monitoring.  The next page of the earnings release expressly qualifies forward looking statements, generally identifies risks from changes in governmental regulations and global political conditions, and specifically references the risks identified in Seadrill's April 2014 Form 20-F, which relate to sanctions as a result of the annexation of Crimea by Russia.  The Rosneft Deal Statements about the backlog are therefore protected by the PSLRA safe harbor.

The Rosneft Deal Statements also fall under the protections of the PLSRA's safe harbor provision because the Complaint does not allege facts to suggest that Defendants had actual knowledge that their statements were false when made.  *See* 15 U.S.C. § 78u-5(c).  The statements themselves were objectively true in describing the Rosneft Frame Agreement and the Rosneft July contracts, as well as the amount of backlog the latter represented.  As to the claim

that Defendants knew the contracts and backlog were in doubt because of the sanctions, to the contrary, the sanctions themselves provided a good faith basis for Defendants to believe that the Rosneft contracts would survive the sanctions.  The Complaint alleges that the Norwegian sanctions required authorization to "export certain categories of goods to the Russian petroleum sector," and that authorization "would normally be given for the export of products if this is to honour obligations under contracts agreed prior to the entry into force of the new regulations." The Rosneft contracts had been agreed to prior to the regulations.  Both the Rosneft Framework Agreement, as well as the July Rosneft contracts were agreed to before August 15, 2014, when the Norwegian regulations were adopted.  *See Sanofi,* 87 F.Supp.3d at 535 (finding that Sanofi's statements fell within the PSLRA safe harbor because Sanofi's knowledge of the FDA's concerns was not enough to give rise to an inference that Sanofi knew its optimistic statements were false and misleading), *aff'd,* 816 F.3d 199 (2d Cir. 2016).

Therefore, Defendants' failure to disclose that NADL had not yet applied for exemption is not an actionable omission and did not render the Rosneft Deal Statements false and misleading.

### ii. Failure to Disclose Private Concerns about the Viability of the Rosneft Deals

The Complaint alleges that undisclosed doubts rendered the Rosneft Deal Statements false and misleading, but it fails to plausibly allege that concerns about the impact of the sanctions were not disclosed to the public.  There can be no omission where the allegedly omitted facts are disclosed.  *See Wilson v. Merrill Lynch & Co.*, 671 F.3d 120, 131-32 (2d Cir. 2011) ("[W]e find no error in the district court's conclusion that [defendant's] disclosures . . . sufficed to preclude [plaintiff's] claim . . . ."); *see also In re Progress Energy, Inc. Sec. Litig.*, 371 F. Supp. 2d 548, 552 (S.D.N.Y. 2005) (finding alleged omissions were disclosed).  Here, the

challenged statements conveyed the very uncertainties that Plaintiffs allege were undisclosed.

Statements such as "we are okay with the situation as of now" and "we monitor the situation

continuously" and "we are not very worried" about the sanctions are sufficiently vague and

equivocal that no reasonable investor could be misled into thinking that sanctions posed no risks

to the Rosneft Deal or Defendants' business.

In addition, the Complaint and documents integral to the Complaint show that Seadrill

and NADL otherwise disclosed the risks that the sanctions posed.  Seadrill's and NADL's Forms

20-F, both filed on April 17, 2014, warned that sanctions imposed by the United States, EU

and/or other international bodies may adversely affect their results of operations if these

sanctions required the termination of existing contracts.  In August 2014, Lundetræ stated that

there was "geopolitical risk" to the Rosneft contracts.  Seadrill's earnings release on August 27,

2014, disclosed that new government regulations applied to offshore drilling activity in Russia

and that Seadrill was currently evaluating the situation and monitoring all developments.  In a

September 11, 2014, news article, Lundetræ acknowledged that Seadrill and NADL "have to be

open" to the possibility that the contracts could be in breach of existing sanctions and that it was

"terribly difficult" to determine whether they were in compliance.  These statements undermine

the assertion that undisclosed concerns about the sanction's impact rendered the challenged

statements false and misleading.

Seeking to sustain their position, Plaintiffs focus on a statement by Lundetræ  in an

August 22, 2014, *Bloomberg* article that "we're not very worried" about the sanctions.  The

statement must be viewed not only in the context of other statements that Defendants were

making at the time, but also in the context of the press article in which it appeared.  The entirety

of Lundetræ's quoted statements are:  "'We're not very worried' that sanctions will affect any

part of the deals, Lundetræ said by phone.  'Rosneft is a very good and constructive partner for us.'"  The short paragraph in the *Bloomberg* article containing Lundetræ's quote is followed by a report that Seadrill's stock price in Oslo fell and Rosneft's stock price in Moscow fell, indicating a negative reaction by the market.  The article provides no context or information about what else Lundetræ may have said about the sanctions that was not included in the article.[3]  The Complaint itself alleges that on the same day, in another publication "August 22, Lundetræ was quoted as saying that Seadrill had not determined whether the sanctions affected its contracts with Rosneft."  "[W]hether an omission makes an expression of opinion misleading always depends on context."  *Omnicare*, 135 S. Ct. at 1330.  Just as investors would not "expect opinions contained in [registration] statements to reflect baseless, off-the-cuff judgments," *id.*, conversely, a reasonable investor would not put much weight on a three-word quote in a news article, where reporters and editors controlled what statements would be included and excluded, what words would be quoted or paraphrased, all in an environment of rapidly changing and escalating sanctions from U.S. and foreign regulators.

Plaintiffs assert that this statement, although an opinion, is not protected under *Omnicare,* 135 S. Ct. at 1326-27, 1332 (a statement of opinion may constitute a securities fraud violation where it is a statement that is objectively false and disbelieved by the defendant at the time it was made, or where it omits material facts about the defendant's inquiry or knowledge) and *Sanofi* for three reasons:  (1) the statement was false when made, as unnamed Seadrill executives were "fret[ting]" about the effects of the sanction; and (2) the statement was not honestly believed, as Lundetræ later stated that doubts about the effects of the sanctions appeared as details became

---

[3] The article was not filed by either party but is integral to the Complaint and available on the internet at http://www.bloomberg.com/news/articles/2016-05-03/hedge-funds-under-attack-as-cohen-says-skilled-people-are-scarce.

available in August 2014; and (3) the statement conflicted with the undisclosed fact that

Defendants had not yet obtained authorization from the Norwegian authorities.

These arguments are unavailing.  The statement is objectively false only if Lundetræ did

not hold the professed belief at the time of the statement.  *See Omnicare,* 135 S. Ct at 1325-26

(rejecting the view "that a statement of opinion that is ultimately found incorrect -- even if

believed at the time made -- may count as an 'untrue statement of material fact.").  The alleged

fretting of unnamed Seadrill executives is sufficiently vague that it does not contradict

Lundetræ's equally vague statement.  Also, Lundetræ's statement "we're not very worried" does

not convey the complete absence of doubt or concern.  As discussed above, the "we're not very

worried" statement gives rise to no duty to disclose that NADL had not yet (but would soon)

apply for authorization to trade under the sanctions.

Accordingly, these statements do not give rise to a viable securities fraud claim.

### b.  The Dividend Statements

The Complaint fails to allege a material misrepresentation or omission with respect to the

Dividend Statements.  The statements made on August 27, 2014, that the Seadrill Board had

decided to maintain current dividend levels, are not actionable as they are accurate, and the

Complaint does not allege otherwise.  *See In re Int'l Bus. Machs. Corporate Sec. Litig.*, 163 F.3d

102, 107 (2d Cir. 1998) (stating the challenged statements were inactionable partly because,

"[a]fter each of the challenged statements were made, [defendant] maintained its dividend at its

prior level").  Seadrill paid the referenced dividend in September 2014.  Only in late November

2014 -- after the US, EU and Norway had adopted additional sanctions against Russia,

specifically targeting Rosneft and deepwater and Arctic oil exploration and production; and after

NADL, Seadrill and Rosneft had agreed to delay the Rosneft Framework Agreement -- did Seadrill announce the suspension of its third quarter dividend.

The remaining statements predicting future dividends are inactionable statements of corporate optimism because they are generalizations that "contain no long-term guarantee or assurance" and were an "expression of optimism that is too indefinite to be actionable under the securities laws." *Id.* at 108; *see also Lasker v. N.Y. State Elec. & Gas Corp.,* 85 F.3d 55, 58–59 (2d Cir. 1996) (per curiam) (predictive statements about earnings not actionable); *San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos.,* 75 F.3d 801, 811 (2d Cir.1996) (statements about earnings and expected product performance not actionable).

Statements on August 27, 2014, such as "we feel increasingly comfortable that this period can be extended well into 2016" and "[w]e expect to be able to support this dividend level for [the] foreseeable future" are also inactionable statements of opinion, and cannot have misled a reasonable investor to believe that Seadrill had committed itself to a particular dividend in the future.

Plaintiffs assert that Seadrill and Wullf lacked a reasonable basis for their stated opinions on August 27, 2014, because of uncertainties about the sanctions' impact on the Rosneft contracts. As discussed above, however, in August 2014, Defendants had a reasonable basis to believe the contracts would be performed, notwithstanding the sanctions, because the Norway sanctions contained a savings clause for preexisting contracts. The US and Norway sanctions without a savings clause and aimed expressly at Rosneft were not adopted until September 12 and October 10, 2014, respectively.

### B. Scienter

The Complaint also fails to allege scienter, providing an independent basis for dismissing the action.

The PSLRA requires a plaintiff to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2)(A). "This standard requires courts take into account 'plausible opposing inferences.'"  *Matrixx*, 563 U.S. at 48 (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323 (2007)).  A complaint sufficiently pleads scienter "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  *Tellabs*, 551 U.S. at 324.  In making this determination, a court must review "all the allegations holistically."  *Tellabs*, 551 U.S. at 326.  In this Circuit, a plaintiff may satisfy the scienter requirement by "alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness."  *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 106 (2d Cir. 2015) (quoting *ATSI*, 493 F.3d at 99).

Here, the Complaint relies solely on the Defendants' alleged conscious misbehavior or recklessness.  As support, the Complaint asserts that the Defendants knew or had access to information suggesting that:  (1) as of August 2014, Lundetræ and other unnamed Seadrill executives had concerns about the impact of sanctions on the Rosneft contracts; (2) NADL did not seek an exemption from sanctions from the Norwegian authorities prior to October 2014; and

(3) an exemption would be difficult to obtain because Norwegian, EU and US officials were purportedly angry that NADL attempted to skirt sanctions.[4]

The Complaint does not sufficiently plead that Defendants consciously or recklessly made false or misleading misrepresentations or omissions.  To sufficiently plead scienter under this theory, the Complaint "must show 'conscious recklessness--*i.e.*, a state of mind approximating actual intent, and not merely a heightened form of negligence.'"  *Stratte-McClure*, 776 F.3d at 106 (quoting *S. Cherry St., LLC v. Hennessee Grp. LLC,* 573 F.3d 98, 109 (2d Cir. 2009)).  Recklessness in the context of a private securities fraud case refers to conduct that "at the least . . . is highly unreasonable and which represents an extreme departure from the standards of ordinary case to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it."  *S. Cherry St.*, 573 F.3d at 109 (quoting *In re Carter-Wallace, Inc. Sec. Litig.*, 220 F.3d 36, 39 (2d Cir. 2000)) (emphasis omitted).  "Where motive is not apparent, it is still possible to plead scienter by identifying circumstances indicating conscious behavior by the defendant, though the strength of the circumstantial allegations must be correspondingly greater."  *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001) (quoting *Beck v. Mfrs. Hanover Tr. Co.,* 820 F.2d 46, 50 (2d Cir. 1987))

---

[4] Plaintiffs also include an argument that as of August 1, 2014, Wullf, Lundetræ, and Løvdal knew, or had access to information suggesting, that the sanctions imposed by the U.S. did not contain a savings clause.  Plaintiffs did not include this information in the Complaint, and it is therefore a matter outside the pleading and not considered on this motion to dismiss.  However, even if it were considered, the argument would fail; Plaintiffs acknowledge that the savings clause is published in the publicly available Federal Register, thus undermining their assertion that Defendants acted with scienter in concealing this information.  *See In re Bank of Am. AIG Disclosure Sec. Litig.*, 980 F. Supp. 2d 564, 586 (S.D.N.Y. 2013) (finding market's access to allegedly concealed information supported compelling inference that defendants reasonably believed no further disclosure was required).

The Complaint fails to allege facts that "approximat[e] actual intent," *S. Cherry St.*, 573 F.3d at 109, to mislead investors into believing that international sanctions posed no threat to the Rosneft contracts and that the dividend would be maintained.  The uncertainties about the sanctions were disclosed as discussed above, thus "undercut[ting] the inference that [Defendants were] attempting to conceal the truth."  *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 186 n.62 (2d Cir. 2014).  The Complaint also does not explain why Defendants were required to disclose that NADL had not requested an exemption from the Norwegian sanctions prior to October 14, 2014, or that unnamed officials were angered by Defendants' actions.  *See Kalnit*, 264 F.3d at 144 ("Because . . . this case does not present facts indicating a clear duty to disclose, plaintiff's scienter allegations do not provide *strong* evidence of conscious misbehavior or recklessness.").

Taken together, the Complaint's allegations do not support a cogent inference of scienter that is "at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324.  Despite Plaintiffs' arguments, the more compelling inference is that Defendants were reacting to an uncertain and rapidly changing environment and attempting to understand the implications of each successive set of sanctions.  *See Stratte-McClure*, 776 F.3d at 107 (stating that "[t]he 'most cogent inference' from these allegations, in tandem with assertions about [a defendant's] internal deliberations, 'is that [the company] delayed releasing information' . . . 'to carefully review' all of the relevant information . . . ." (quoting *Matrixx*, 563 U.S. at 49 n.15)).  According to the Complaint, Seadrill was attempting to understand the implications of sanctions on the Rosneft contracts, had not determined whether sanctions affected the Rosneft contracts as of August 2014 and was "monitor[ing] the situation

continuously." Viewed as whole, the "non-culpable explanation" for the facts alleged in the Complaint is more compelling and plausible than the narrative Plaintiffs offer.

Accordingly, the Complaint's failure to adequately plead scienter provides an independent basis for dismissal.

### C.  Section 20(a) Claim

"To establish a prima facie case of control person liability, a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." *ATSI*, 493 F.3d at 108.  As the primary claim here is dismissed, the § 20(a) claim must be dismissed as well.  *See Gavin/Solmonese LLC v. D'Arnaud-Taylor*, No. 15-160-cv, 2016 WL 125434, at *6 (Jan. 12, 2016) (summary order).

### D.  Motion to Strike

As the Complaint is dismissed, Defendants' motion to strike allegations against non-party John Fredriksen is denied as moot.  Plaintiffs are warned, however, that, if they move for leave to amend their complaint, they should include only allegations that are relevant to this case.

## IV.   CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is GRANTED and the motion to strike is DENIED as moot.  Given the deficient nature of the "failure to warn" theory of the Complaint, it is highly likely that any motion to amend the Complaint would be futile and therefore denied.

Nevertheless, having requested leave to amend in the event of dismissal, Plaintiffs may file a motion to amend, which attaches a proposed amended complaint marked to show changes, within twenty-one days of this Opinion and Order.  Defendants shall respond to any motion to amend within twenty-one days after the filing of any such motion.

The Clerk of Court is directed to close Dkt. No. 72.

SO ORDERED.

DATED:  June 20, 2016
New York, New York

LORNA G. SCHOFIELD
UNITED STATES DISTRICT JUDGE